**Clarence H. STEVENSON, III, an individual and F M C Corporation, a corporation, Plaintiffs-Appellees,**

v.

**DIEBOLD, INCORPORATED, a corporation, Defendant-Appellant.**

**No. 23227.**

United States Court of Appeals, Ninth Circuit.

Feb. 17, 1970.

Rehearing Denied May 4, 1970.

Carl Hoppe (argued), of Eckhoff & Hoppe, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., Theodore E. Simonton, Cazenovia, N. Y., for appellant.

Roland N. Smoot (argued), of Lyon & Lyon, Los Angeles, Cal., Flehr, Hohbrach, Test, Albritton & Herbert, San Francisco, Cal., for appellees.

Before DUNIWAY and CARTER, Circuit Judges, and CROCKER *, District Judge.

DUNIWAY, Circuit Judge:

Diebold appeals from a judgment holding certain claims of appellees' patent valid and infringed [1] and awarding dam-

---

* Honorable M. D. Crocker, United States District Judge, Eastern District of California, sitting by designation.

1. See Stevenson v. Lamson Corp., 210 F. Supp. 917. The judgment entered pursuant to the memorandum opinion of the district court found the patent to be valid and infringed, awarded plaintiffs an accounting for damages, and granted an injunction against further infringement. No appeal was taken.

ages of $404,470.50 plus interest for the infringement.[2] The patent at issue is No. 2,815,846, owned by appellee Stevenson and exclusively licensed to appellee FMC. We reverse.

The invention covered by the Stevenson patent relates to feeding and orienting devices for automatic pallet loading machines. The invention seeks to position articles such as cartons moving on a conveyor so as automatically to stack them on a pallet in a predetermined interlocking pattern. The interlocking pattern promotes stability of the pallet load and is achieved by placing layers of articles adjacent to one another with the faces of the articles in a given layer turned at 90 degrees from the article faced in neighboring layers, much as bricks or stones are arranged in a good piece of masonry.

Before trial, Diebold[3] conceded that claims 1, 2, 4–6, 9–11, 13–16, and 18–20 of the Stevenson patent were infringed "if such claims be valid." In appealing from the trial court's decision that the patent was valid, Diebold makes only the contention that the invention was obvious within the standards of 35 U.S.C. § 103.

Section 103's condition of nonobviousness for the issuance of a patent has been considered by the Supreme Court in Graham v. John Deere Co., 1966, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545; United States v. Adams, 1966, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 and Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 1969, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258. In *Graham* the Court stated:

"The emphasis on non-obviousness is one of inquiry, not quality, and, as

such, comports with the constitutional strictures.

While the ultimate question of patent validity is one of law, * * * the § 103 condition, which is but one of three conditions each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained, and the level of ordinary skill in the pertinent art resolved." (383 U.S. at 17–18, 86 S.Ct. at 693–694)

See also Spring Crest Co. v. American Beauti Pleat, Inc., 9 Cir., 1970, 420 F.2d 950; Carborundum Co. v. Wilbanks, Inc., 9 Cir., 1969, 420 F.2d 43; Proler Steel Corp., Inc. v. Luria Bros. & Co., 9 Cir., 1969, 417 F.2d 272; Aerotec Industries of California v. Pacific Scientific Co., 9 Cir., 1967, 381 F.2d 795; Jeddeloh Brothers Sweed Mills, Inc. v. Coe Mfg. Co., 9 Cir., 1967, 375 F.2d 85.

Here, as in all cases where a patent's validity is questioned, the patent is presumed to be valid, and the burden of showing invalidity rests on the party asserting it. See 35 U.S.C. § 282; Western Lighting, Inc. v. Smoot-Holman Co., 9 Cir., 1966, 381 F.2d 355; Eimco Corp. v. Peterson Filters and Engineering Co., 10 Cir., 1968, 406 F.2d 431. Nonetheless, this court has recognized that "the concept of invention is inherently elusive when applied to a combination of old elements," particularly in a mechanical area such as this one. Jeddeloh Brothers Sweed Mills, Inc. v. Coe Mfg. Co., *supra*, 375 F.2d at 88 and n. 5. Moreover, the "patent standard is basically constitutional" Anderson's-Black Rock, Inc., *su-*

---

2. The accounting issues were tried to a special master. On May 28, 1968, the district court entered its final judgment based on the master's report. This judgment readopted the earlier decision regarding validity, infringement, and injunctive relief.

   "Although the interlocutory decision * * * on the question of validity and infringement was appealable, * * * the decision was not final until the con-

clusion of the accounting." Marconi Wireless Telegraph Co. of America v. United States, 1943, 320 U.S. 1, 47, 63 S.Ct. 1393, 1415, 87 L.Ed. 1731. Accordingly, the question of patent validity is still open on this appeal.

3. Lamson Corp., the orginal defendant in this action, merged with Diebold, Inc. in 1965, and Diebold was substituted as a party defendant at that time.

*pra,* and the ultimate question of patentability is one of law.

█ Accordingly, we turn to the factors which *Graham* mentions as bearing on obviousness, and to the district court's treatment of those factors.

"Palletizing" has been used for over 40 years to stack a number of articles such as cartons or boxes on portable platforms called pallets. Pallet loads are a standard means of handling materials for shipment and storage. Throughout the period ending with World War II, no automated means of loading pallets was known. The pallet interlocking patterns were stacked by hand or by using semi-automatic devices in which a man would turn some of the cartons or articles on a ball table.

Stevenson had observed palletizing systems used during World War II, and in 1946 he began to work on a completely automated means of loading pallets. By the end of 1947 he had developed a model of a pallet loader which led to the patent questioned in this case. Stevenson's model is most completely described by claim 18 of his patent [4].

"An article feeding device comprising [1] conveying means for conducting the articles along a predetermined path, [2] a normally-ineffective article obstructing element located at one side of said conveying means and arranged to be projected into the path of oncoming articles on said conveying means at one side only of the center of the path to effect turning of the articles about an axis perpendicular to said conveying means into a position for further advancement thereof, and [3] means operable to effect projection of said article obstructing means into the path of selected articles on said conveying means." (The bracketed numbers have been added to separate the three elements of Stevenson's device.)

In every day English and in application, claim 18 describes (1) a "live-roll" feed conveyor, *i. e.,* a conveyor with power driven rollers, (2) an obstruction means such as a pin, plunger, finger, or flag placed to one side of the conveyor's midline, and (3) a control mechanism for moving the pin, etc. into or out of the path of selected articles moving down the conveyor.

In operation certain of the articles move along the conveyor without hindrance from the obstruction. For selected others, the control mechanism moves the obstruction into their path. The selected article strikes the obstruction, and because the powered rollers keep the article moving, the article pivots around the obstruction to get free of it and in so doing faces around at a 90 degree angle from its original position on the conveyor. With a control mechanism set to achieve a given pallet pattern, Stevenson's device can automatically turn selected articles and thus obtain interlocking pallet loads without the necessity of turning the articles by hand.

As one might expect, Stevenson was not the only would-be inventor working on a "palletizer." A John K. Bruce began working on the problem in 1943. Bruce had some success and filed a patent application for his device on February 2, 1948, about four months before Stevenson filed. Bruce's orienting means used a different principle than Stevenson's did. Rather than a simple obstruction placed off-center on a conveyor, Bruce's orienting means

"consisted of a turntable located immediately below the conveyor leading to the pallet loader proper, which turntable, in response to previous programming, was adapted to be raised above the level of the conveyor as an article to be turned passed thereover, the turntable first lifting the article from

4. At trial it was "stipulated that trial be limited to a consideration of the validity of claims 1, 14, and 18 and that each of the other * * * claims would be held valid or invalid consistent with the decision of the Court in respect to each of said claims 1, 14, and 18." (Finding No. 25, TR-910.) Claim 1 relates to a "conveyor device" and claim 14 relates to a "control" for a palletizer with essentially the same characteristics as the "article feeding device" described by claim 18.

the conveyor, then turning it the requisite 90°, then stopping, and then returning to beneath the conveyor level to redeposit the reorientated article on the conveyor to pass into the pallet loader proper." (Trial Court's Finding No. 13.)

It's apparent that Bruce's control device and conveyor were quite similar to Stevenson's, but that the means of article orientation were quite different. Bruce believed that he had to lift the articles from the conveyor to reorient them.

Nonetheless, the conveyor industry had known for some time of the concept of using a simple pin or finger to obstruct the path of articles moving down a powered conveyor and thus turn the articles. Patent No. 1,028,766, issued to W. L. Montgomery on June 4, 1912, discloses a device intended to achieve 90 degree reorientation of articles moving down a conveyor, chiefly for use in feeding articles to a sealing machine. Montgomery claimed:

"The combination with [1] a movable belt, [2] of a finger secured rigidly at one side of the belt and extending substantially perpendicular thereto and adjacent the center of said belt, and [3] an inclined guide located at one side of said belt spaced from said finger." (Claim 2.) (Bracketed numbers added.)

There is a good deal of other, similar, prior art shown in the record.

Diebold argues that the Stevenson device is obvious in light of the prior art as disclosed by the Bruce and Montgomery patents. Diebold asserts that Stevenson did no more than assemble on one conveyor the Montgomery article turning finger and operate it selectively with Bruce's control mechanism. Stevenson counters by asserting (1) that his combination produces a new result which had not been achieved by any other device, (2) that he applied a new principle not previously used by men skilled in the materials handling art, and (3) that the components of his combination in fact

perform a different function in the combination than they do out of it.

Our task in evaluating the contentions of the parties is made considerably easier because they tried the case as if they fully appreciated the *Graham-Adams* teachings, even though those decisions were written nearly four years after this case was heard below.

We first consider Stevenson's second and third asserted grounds supporting nonobviousness. It seems apparent to us that the turning means and the control mechanism in Stevenson's device serve precisely the same purposes there as they did, respectively, in Montgomery and in Bruce. The trial court, however, did find that the two means when combined performed a different function than they did when apart. It pointed to the fact that in Stevenson "the conveyor itself unites with the obstruction means to turn a selected article according to programming. * * *" (Finding No. 32.) In comparison, in Bruce the turning means required that the article be lifted free of the conveyor, turned, and then returned to the conveyor. As the trial court found, this difference does give Stevenson's device two important advantages: first, with Stevenson increased conveyor speed results in faster article turning leading to greater flexibility and capacity over Bruce, and second, Bruce did not work well with articles having rough or damaged bases or having high, narrow shapes, but Stevenson's device is reliable over a large spectrum of shapes.

Proof was adduced at trial that Bruce's device was a commercial failure and that Stevenson's was a success. In fact most of the Bruce machines were converted to use Stevenson's method of turning. But, Bruce disclosed not the turning means, but the control device used by Stevenson. Montgomery had shown how to combine an obstruction with a power driven conveyor many years before. Thus, the principles disclosed by Bruce and Montgomery are combined without change as to function in Stevenson. We conclude that Steven-

son's second and third grounds of support for the validity of his patent are without merit.

The question remains whether, notwithstanding the Bruce and Montgomery patents, the result achieved by Stevenson was so new and unexpected that it would not have been obvious to a person of ordinary skill in the materials handling art. With the advantage of hindsight, what Stevenson did was hardly remarkable, and the means used are simple indeed. But as *Graham* points out, hindsight can be misleading, and what is important is the state of the art at the time of invention. See 383 U.S. at 35–36, 86 S.Ct. 684, 15 L.Ed.2d 545.

Anyone looking at this litigation today would wonder why Bruce adapted a suitable control device to a complicated, unreliable turning mechanism when Stevenson's solution appears so much more apparent and desirable. In answer, Stevenson relies upon the testimony of a witness expert in the pallet loader field. The witness, a Mr. Hallett, was an engineer who had been the long-time publisher of a trade magazine in the materials handling industry. He testified as follows, referring to the year 1947:

"Q. Based on that experience and your previous experience in the conveyor art, were you faced with the problem of providing the orientation for the pattern in a pallet loader, would any particular solution to that problem be obvious to you?

A. No.

\* \* \* \* \* \*

Q. You said the solution wouldn't be readily apparent. I asked you, in effect, why not. Give your reasons for your answer.

\* \* \* \* \* \*

A. Well, it would appear that it would need to obtain positive 90-degree turning, and a turning pin would not be obvious to provide that positive turning.

Q. I see. What about reliability?

A. Again, it would be a problem in terms of obtaining the positive turning with various size cartons, particularly long ones or tall ones, and this again might—again would appear to be—the turning pin would not provide the obvious solution.

Q. What direction would you go in, Mr. Hallett?

A. It would seem to be that anyone, any skilled designer in the conveyor art, would think in terms of positive turning as being something that would actually be lifted up and turned either by machinery such as a turntable or perhaps by hand, such as the semiautomatic principle of the Greer machine.

\* \* \* \* \* \*

Q. How, then do you, or did you in practicing your profession of evaluation and reporting to the industry in regard to new things in the material-handling art, account for the success of the turning-pin principle?

\* \* . \* \* \* \*

A. Well, it is hard to evaluate it but if we were not looking from hindsight, it would seem to me that it would be very surprising that the turning pin would be successful at that time."

On cross-examination, the witness testified:

"Q. When did you first see a rotate pin in a conveyor system? I am not limiting this to pallet loaders, but any sort of a conveyor system. When did you first see a rotate pin or equivalent?

A. The first rotate pin that I saw was on a pallet loader, and I believe it was the Lamson machine in the Bayonne refinery of Esso.

Q. Can you recall about the year?

A. My impression was it was 1954.

Q. And that was the first time you ever saw a rotate pin in a conveyor system of any sort?

A. The first that I recall."

There is no evidence that Hallett was familiar with the Montgomery patent, which issued in 1912. As we have seen, that patent used exactly the means that

Stevenson's patent uses to turn the packages 90 degrees while they move along a powered conveyor. We must assume knowledge of Montgomery when considering nonobviousness. It is inconceivable to us that Hallett would have testified as he did, or that the court would have believed him, had he been familiar with Montgomery. There is some evidence, not coming from Hallett, that he may have known of some prior art that used an obstruction to turn articles moving on a conveyor. There is none to support his view that such devices would not work. *Cf.* Anderson's-Black Rock, Inc., n 1. As proof of nonobviousness, his testimony is worthless.

The plain fact is that the patent combines the turning means disclosed by Montgomery and other prior art shown by the record with the programming of Bruce, which permits selective turning of the packages on the conveyor. Montgomery was not considered by the patent office. Other, similar, prior art was, including German Patent No. 479,675. The patent office distinguished it on the ground that, in the prior art, the pin, flag or other turning means was stationary, whereas in Stevenson it can be selectively removed from and reinserted in the path of the articles moving on the conveyor, thus achieving selective turning. But the selectivity device was disclosed in Bruce. The patent office distinguished Bruce as using a different turning means. This is circular reasoning with a vengeance. The patent office rejected the claim now made much of by appellees, that the selectivity feature was new. (See file wrapper, patent No. 2,815,846, pp. 82–83.) Appellees' primary reliance is on the use of an obstructing means in the conveyor, rather than a turntable or similar device, to turn the parcels. That is not new with the Stevenson patent.

Reliance is also placed upon considerable commercial success for the Stevenson device. But as the Supreme Court said in Anderson's-Black Rock, Inc., *supra*:

"It is, however, fervently argued that the combination filled a long felt want and has enjoyed commercial success. But these matters 'without invention will not make patentability.' Great A & P Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 153, 71 S.Ct. 127, 130, 95 L.Ed. 162."

We conclude that the principles laid down in the cases that we have cited require a holding that the pertinent claims, 1, 3, 4–6, 9–11, 13–16, and 18–20 of the Stevenson patent, No. 2,815,846, are invalid, and we so hold.

Reversed.